25-1162
*Mueller v. Deutsche Bank AG*

# United States Court of Appeals
# For the Second Circuit

August Term 2025

Argued: December 11, 2025
Decided: August 3, 2026

No. 25-1162

RICHARD MUELLER II, individually and for the estate of Kayla Mueller, MARSHA MUELLER, ERIC MUELLER, DIANE FOLEY, individually and for the estate of James Foley, JOHN W. FOLEY, JOHN E. FOLEY, MARK FOLEY, KATHRYN SIMPSON, MICHAEL FOLEY, ARTHUR SOTLOFF, individually and for the estate of Steven Sotloff, SHIRLEY SOTLOFF, LAUREN SOTLOFF,

*Plaintiffs-Appellants*,

*v.*

DEUTSCHE BANK AKTIENGESELLSCHAFT, DEUTSCHE BANK TRUST COMPANY AMERICAS,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Southern District of New York
No. 24-cv-6225, Denise L. Cote, *Judge*.

Before: CHIN, SULLIVAN, and NATHAN, *Circuit Judges*.

The Trafficking Victims Protection Reauthorization Act (the "TVPRA") grants victims of human trafficking and similar offenses a private right of action

against those who carried out the abuse. Victims are not, however, limited to suing the perpetrators themselves; they may also recover damages from anyone who "knowingly benefit[ted], or attempt[ed] or conspire[d] to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in" an underlying violation of the statute. 18 U.S.C. § 1595(a).

In this case, the estates and family members of three Americans ("Plaintiffs") who were kidnapped, enslaved, and eventually murdered by the Islamic State of Iraq and Syria ("ISIS") allege that Deutsche Bank violated the TVPRA by enabling a global fundraising operation designed to support the terrorist organization and its affiliates. The viability of that claim depends on whether Deutsche Bank's alleged conduct – providing banking services to two of its al-Qaeda-affiliated customers in Europe and to certain ISIS-controlled banks in Iraq – rises to the level of participation in a venture with ISIS and its affiliates. The district court (Cote, *J.*) dismissed Plaintiffs' claims because it held that Deutsche Bank's routine business transactions did not rise to that level. We agree and therefore affirm the district court's dismissal of Plaintiffs' complaint.

AFFIRMED.

MATTHEW J. FISHER (Geoffrey P. Eaton, *on the brief*), Sparacino PLLC, Washington, DC, *for Plaintiffs-Appellants*.

DAVID G. JANUSZEWSKI (Sheila C. Ramesh, Sesi V. Garimella, Naomi W. Wossen, Nina P. Rosella, *on the brief*), Cahill Gordon & Reindel LLP, New York, NY, *for Defendants-Appellees*.

RICHARD J. SULLIVAN, *Circuit Judge*:

The Trafficking Victims Protection Reauthorization Act (the "TVPRA") grants victims of human trafficking and similar offenses a private right of action against those who carried out the abuse. Victims are not, however, limited to suing

the perpetrators themselves; they may also recover damages from anyone who "knowingly benefit[ted], or attempt[ed] or conspire[d] to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in" an underlying violation of the statute. 18 U.S.C. § 1595(a).

In this case, the estates and family members of three Americans ("Plaintiffs") who were kidnapped, enslaved, and eventually murdered by the Islamic State of Iraq and Syria ("ISIS") allege that Deutsche Bank Aktiengesellschaft and Deutsche Bank Trust Company Americas (together, "Deutsche Bank") violated the TVPRA by enabling a global fundraising operation designed to support the terrorist organization and its affiliates. The viability of that claim depends on whether Deutsche Bank's alleged conduct – providing banking services to two of its al-Qaeda-affiliated customers in Europe and to certain ISIS-controlled banks in Iraq – rises to the level of participation in a venture with ISIS and its affiliates. The district court dismissed Plaintiffs' claims because it held that Deutsche Bank's routine business transactions did not rise to that level. We agree and therefore affirm the district court's dismissal of Plaintiffs' complaint.

# I. Background

The relevant facts in this case are taken from Plaintiffs' complaint. For the purposes of this appeal, we assume the truth of those facts and read them in the light most favorable to Plaintiffs' claims. *See Palmer v. Amazon.com, Inc.*, 51 F.4th 491, 503 (2d Cir. 2022).

## A. Factual Background

ISIS rose to prominence between 2013 and 2014 as the successor to al-Qaeda-in-Iraq ("AQI"), which was originally a branch of the al-Qaeda terrorist network. ISIS, AQI, and al-Qaeda "embraced every element of human trafficking as a core component of their operations for decades, including by using trafficked humans and forced labor to raise funds and extract substantial cash-equivalent value for their organization." J. App'x at 22 ¶ 64.

Plaintiffs allege that Deutsche Bank "participated in a global fundraising venture for al-Qaeda and [AQI (later ISIS)]." *Id.* at 13 ¶ 24. The purpose of the fundraising venture was to further support these groups' "terrorist attacks and . . . trafficking crimes, which in turn generated additional revenues." *Id.*

According to Plaintiffs, Deutsche Bank participated in the fundraising venture in two ways: (i) by providing financial services to two Europe-based al-

Qaeda fundraisers, which allowed those individuals to generate funds for al-Qaeda (and by extension AQI) through value-added tax ("VAT") fraud schemes; and (ii) by providing banking services to ISIS-controlled banks, which enabled ISIS to access the U.S. and international financial systems. We briefly describe the alleged factual basis underlying each theory.

*1. The VAT Fraud Schemes*

Plaintiffs allege that Deutsche Bank participated in two Europe-based VAT fraud schemes spearheaded by al-Qaeda fundraisers Samir Azizi and Imran Yakub Ahmed. In a nutshell, VAT is "a tax on the value added to a product, imposed at each stage in the supply chain, from manufacture to delivery of the finished product to the final consumer." *Id.* at 29–30 ¶ 89. At each step in the supply chain, the seller "charges VAT to its immediate customers based on the value it has added to the product." *Id.* at 30 ¶ 89. The seller must then "report its sales and pay to the government the VAT due – but may deduct from that payment any VAT it already paid on the product." *Id.* Under such a system, "goods make their way through the supply chain with each buyer and seller reporting sales and paying the relevant VAT at each step." *Id.* The "Azizi Cell" and "Ahmed Cell," as Plaintiffs label the two schemes, allegedly defrauded European governments

by using forged invoices and sham transactions to claim unwarranted VAT refunds and deductions, which they then laundered and remitted to al-Qaeda.

To Plaintiffs, "Deutsche Bank's knowing and willing participation helped the Azizi Cell's VAT Fraud scheme succeed." *Id.* at 34 ¶ 101. In particular, Azizi "used accounts at several Deutsche Bank branches – including branches in New York, Frankfurt, and London – to conduct his Cell's VAT fraud scheme." *Id.* at 34 ¶ 102. Thus, the proceeds from the Azizi Cell's scheme "flowed through Deutsche Bank accounts at various points." *Id.* at 34 ¶ 103. Plaintiffs further allege that Deutsche Bank facilitated the Azizi Cell by "enabl[ing] [the] execution of the trades that formed the basis for VAT fraud," "prepar[ing] key documentation that enabled the execution of the scheme," and, by virtue of its involvement, giving those trades "a veneer of professionalism and legitimacy" that enabled the scheme. *Id.* at 39 ¶ 118. Deutsche Bank also allegedly "enabled proceeds of the VAT fraud scheme to be converted to U.S. dollars" and "helped the Azizi Cell transfer funds to accounts controlled by or affiliated with al-Qaeda." *Id.* In Plaintiffs' telling, the Azizi Cell succeeded in raising approximately ten million dollars for al-Qaeda. And Deutsche Bank assisted the Ahmed Cell in much the same way by facilitating

the VAT fraud scheme and transferring funds to al-Qaeda accounts. *See id.* at 42–43 ¶¶ 133–39.

According to the complaint, Deutsche Bank "earned interest, commissions, and fees from maintaining accounts" used by the Azizi and Ahmed Cells to carry out their respective schemes. *Id.* at 83 ¶¶ 277, 280. Deutsche Bank also allegedly "earned commissions and fees from transactions performed by" the Azizi and Ahmed Cells "in connection with the . . . VAT fraud." *Id.* at 83 ¶¶ 278, 281. And, according to Plaintiffs, Deutsche Bank "knew that if it refused to execute transactions" for the Cells, it would "lose [their] accounts." *Id.* at 83 ¶ 279, 84 ¶ 282. Finally, Plaintiffs allege that Azizi touted Deutsche Bank as a "willing financial partner" of the Azizi Cell during this time, *id.* at 34 ¶ 103 (emphasis omitted), and that Deutsche Bank "charged fees above normal rates" given the "high-risk and suspicious nature of the individuals and entities involved in [these] transactions," *id.* at 84 ¶ 283.

2. *The ISIS-Controlled Banks*

AQI, which had recently renamed itself ISIS, formally split from al-Qaeda in February 2014. Within months, ISIS gained control over a significant amount of territory in Iraq, including the major northern city of Mosul. As ISIS continued to

expand its territory, it seized control of a large number of banks – as many as 121 branches in total by some estimates, including both Iraqi state-run banks and branches of international banks. Those bank seizures gave ISIS an enormous financial windfall, allowing it to "become the richest terrorist organization on Earth." J. App'x at 46 ¶ 150 (internal quotation marks omitted).

ISIS, nonetheless, had trouble capitalizing on its newfound wealth. Because much of the seized cash was denominated in the Iraqi dinar, it was "difficult" for ISIS to spend that cash outside of the country. *Id.* at 46 ¶ 151. And without the ability to access the international financial system, ISIS would have struggled to "pay external parties for weapons, goods[,] and services." *Id.* at 47 ¶ 152 (internal quotation marks omitted). Indeed, "ISIS's very *survival* depended on its ability to launder money seized from Iraqi banks." *Id.* at 46 ¶ 152 (alteration adopted and internal quotation marks omitted). The organization therefore needed a way to exchange its dinars for foreign currency – U.S. dollars in particular – and to otherwise access the international and U.S. financial systems.

To that end, ISIS sought to "exploit[] correspondent[-]banking relationships that [its seized Iraqi banks] had with banks located in the United States." *Id.* at 47 ¶ 154. A correspondent-banking relationship is "an arrangement under which one

bank ([a] correspondent) holds deposits owned by other banks (respondents) and provides payment and other services to those respondent banks." *Id.* at 47 ¶ 155 (internal quotation marks omitted). Such an arrangement is generally necessary "when a sender seeks to transfer funds to a recipient whose bank lacks a direct relationship with the sender's bank." *Id.* In that situation, the sender relies on correspondent banks "to establish a chain of banking relationships that can complete the transfer from sender to recipient." *Id.* at 48 ¶ 155. Correspondent banking may also involve U.S.-dollar clearing, a process by which counterparties use a U.S. bank to settle "U.S.[-]dollar-denominated transactions." *Id.* (internal quotation marks omitted).

As relevant here, "Deutsche Bank knowingly performed U.S.[-]dollar-clearing and correspondent[-]banking services" for ISIS-controlled banks, "thereby providing ISIS with access to the U.S. financial system." *Id.* at 58 ¶ 194. In that capacity, Deutsche Bank allegedly "processed thousands of transactions – worth billions of dollars – involving" ISIS-controlled banks. *Id.* at 58 ¶ 196 (emphasis omitted).

## B. This Litigation

Between 2013 and 2015, ISIS kidnapped and "forcibly detained" Kayla Mueller, James Foley, and Steven Sotloff. J. App'x at 93 ¶ 321. During their captivity, Mueller, Foley, and Sotloff "suffered months or years of horrific physical pain, unspeakable mental anguish, and – in . . . Mueller's case – rape and sexual abuse." *Id.* Eventually, ISIS murdered each one of them.

Mueller's, Foley's, and Sotloff's estates and family members commenced this civil action against Deutsche Bank on August 16, 2024, seeking monetary damages under the TVPRA. Plaintiffs allege that ISIS subjected the three hostages to involuntary servitude, forced labor, human trafficking, and sex trafficking in violation of the TVPRA. *See* 18 U.S.C. §§ 1584, 1589–91. They seek to hold Deutsche Bank liable for ISIS's underlying TVPRA violations under a theory of beneficiary liability – *i.e.*, that in providing financial services to ISIS-controlled banks and to al-Qaeda's fundraisers in Europe, Deutsche Bank benefitted from its "participation" in a "venture" that it knew or should have known was engaged in human trafficking and other violations of the statute. *Id.* § 1595(a).

Deutsche Bank moved to dismiss Plaintiffs' complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) and for failure to state

a claim under Rule 12(b)(6). The district court declined to dismiss the case for lack of personal jurisdiction, but it agreed with Deutsche Bank that Plaintiffs had failed to plausibly allege both the participation and knowledge elements of their TVPRA claim, which it accordingly dismissed. Plaintiffs timely appealed.

## II. STANDARD OF REVIEW

We review *de novo* a district court's dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6), "accepting the allegations in the complaint as true and drawing all reasonable inferences in favor of the plaintiff." *Palmer*, 51 F.4th at 503. To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). And "[a] claim has facial plausibility when the plaintiff pleads" facts sufficient to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In other words, the complaint "must 'raise a reasonable expectation that discovery will reveal evidence' of the wrongdoing alleged." *Citizens United v. Schneiderman*, 882 F.3d 374, 380 (2d Cir. 2018) (quoting *Twombly*, 550 U.S. at 556).

## III. DISCUSSION

To plead a claim for beneficiary liability under the TVPRA, a plaintiff must plausibly allege that: (i) he is the victim of an underlying violation of the statute; (ii) the defendant participated in the venture that carried out the violation and caused the victim's injury; (iii) the defendant knew or should have known that the venture had engaged in an act that violated the statute; and (iv) the defendant knowingly benefitted from, attempted to benefit from, or conspired to benefit from its participation in the venture financially or by receiving anything of value. 18 U.S.C. § 1595(a). On appeal, Plaintiffs challenge the district court's conclusion that their complaint failed to plausibly allege that Deutsche Bank (i) participated in a venture that it (ii) knew or should have known had engaged in underlying violations of the TVPRA.

We hold that Plaintiffs have not plausibly alleged that Deutsche Bank engaged in conduct rising to the level of "participation in a venture" with ISIS or its fundraisers. Accordingly, we affirm the district court's dismissal of Plaintiffs'

complaint without deciding the question of whether Deutsche Bank knew or should have known that the venture violated the TVPRA.[1]

**A. The TVPRA's Participation Element**

We begin by defining the statutory phrase "participation in a venture" for purposes of section 1595(a), which is an issue of first impression for our Court.

As an initial matter, we reject Plaintiffs' invitation to import section 1591(e)'s statutory definitions of "participation in a venture" and "venture" into section 1595(a). Pls.' Br. at 27–28.[2] Section 1591, which prescribes the standard for *criminal* trafficking liability, expressly provides that those definitions apply only "[i]n [that] section." 18 U.S.C. § 1591(e). And given that section 1591 pairs its expansive definitions of those terms with additional protections – such as heightened mental-state requirements – that are absent from section 1595(a), we do not infer that Congress intended section 1591(e)'s "idiosyncratic" definitions to control the scope of *civil* liability. *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 724 (11th Cir. 2021). To the contrary, reading those bespoke definitions into section 1595(a) would be

[1] We also do not reach the parties' arguments as to (i) whether Deutsche Bank knowingly benefitted from the alleged venture, and (ii) whether Plaintiffs must plausibly plead that Deutsche Bank knew that the venture had trafficked the specific Plaintiffs who brought suit.

[2] *See* 18 U.S.C. § 1591(e)(4) ("The term 'participation in a venture' means knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)."); *id.* § 1591(e)(6) ("The term 'venture' means any group of two or more individuals associated in fact, whether or not a legal entity.").

"particularly inappropriate" given that "Congress has shown that it knows how to adopt the omitted language or provision" expressly. *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019).

Because the TVPRA does not define "participation in a venture" for purposes of section 1595(a), we must give that phrase its "ordinary, contemporary, common meaning." *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022) (internal quotation marks omitted). The ordinary meaning of "participation" is "the action of taking part in something." *Participation*, NEW OXFORD AMERICAN DICTIONARY (3d ed. 2010); *see also Participation*, BLACK'S LAW DICTIONARY (9th ed. 2009) ("The act of taking part in something."). And a "venture" is a "risky or daring journey or undertaking," *Venture*, NEW OXFORD AMERICAN DICTIONARY, *supra*, especially "a speculative commercial enterprise," *Venture*, BLACK'S LAW DICTIONARY, *supra*. Accordingly, we understand the phrase "participation in a venture" to require a showing that the defendant took part in an enterprise or undertaking that involved elements of risk, potential gain, or both. Our sister circuits do, too. *See Doe 1 v. Apple Inc.*, 96 F.4th 403, 415 (D.C. Cir. 2024) (defining the phrase as "taking part or sharing in an enterprise or undertaking that involves danger, uncertainty, or risk, and potential gain"); *see also Doe #1 v. Red Roof Inns*, 21 F.4th at 726 (defining the

phrase as "taking part in a common undertaking or enterprise involving risk and potential profit"); *see also G.G. v. Salesforce.com, Inc.* ("*Salesforce*"), 76 F.4th 544, 560 (7th Cir. 2023) (defining the phrase as a "continuous business relationship, which gives rise to an inference, drawn in the plaintiff's favor, that the civil defendant facilitated the venture's success" (internal quotation marks omitted)).

In determining whether TVPRA defendants sufficiently "took part" in the alleged trafficking venture, our sister circuits have emphasized various factors. Among them are whether the defendant owned an interest in the venture; whether the defendant acted with the purpose or desire to promote the venture's success; whether the defendant and the venture otherwise acted with a common purpose; whether the defendant maintained a continuous relationship with the venture; whether the defendant exercised control over the venture's operations; and whether the defendant's association with the venture went beyond a mere arm's-length transaction. *See Apple*, 96 F.4th at 415–16; *Salesforce*, 76 F.4th at 560–62; *Red Roof Inns*, 21 F.4th at 726–27; *Ricchio v. McLean*, 853 F.3d 553, 555–57 (1st Cir. 2017) (Souter, *J.*). While each case will ultimately turn on its own facts, we agree with our sister circuits that these factors will help to determine whether a TVPRA

defendant's association with a venture rises to the level of "participation" under the statute.

### B. Plaintiffs' Allegations of Participation by Deutsche Bank

Plaintiffs allege that Deutsche Bank provided bank accounts to individuals associated with the Azizi and Ahmed Cells, and that the proceeds of the schemes flowed through these accounts. Deutsche Bank also allegedly prepared unspecified documentation and processed transactions that enabled the scheme. These allegations, however, establish little more than an arm's-length business relationship between a bank and its customers, as well as the routine provision of ordinary, nondifferentiated financial services. There is no indication that Deutsche Bank acquired a financial interest in the schemes, that Deutsche Bank exercised operational control over the schemes, that Deutsche Bank provided specialized services to individuals involved in the schemes, or that Deutsche Bank and the fraudsters acted with a common purpose. Plaintiffs' allegations therefore fail to plausibly show a "shared enterprise," *Apple*, 96 F.4th at 415, or a "common undertaking," *Red Roof Inns*, 21 F.4th at 726–27, between Deutsche Bank and its al-Qaeda-affiliated customers in Europe.

Plaintiffs' allegations with respect to the ISIS-controlled banks fare no better. The correspondent-banking services that Deutsche Bank allegedly provided to those banks consisted of processing transactions as a financial intermediary and performing U.S.-dollar-clearing services. Nothing about those services indicates a common enterprise: Deutsche Bank possessed no interest in the ISIS-controlled banks beyond its general interest in earning fees by offering correspondent-banking services, did not exercise control over their operations, did not provide specialized services, and did not share a common business purpose with them. Instead, as alleged, Deutsche Bank merely provided routine financial services for the purpose of furthering *its* business. That is, Deutsche Bank's posture with respect to the Iraqi banks was one of a passive service provider, not a co-venturer.

These facts stand in stark contrast to the allegations that the Seventh Circuit found sufficient to plead participation in *Salesforce*. There, the defendant had entered into "several lucrative contracts" with the now-defunct advertising site Backpage.com (an alleged sex-trafficking site), *Salesforce*, 76 F.4th at 560, through which the defendant provided "close business advice and consulting," *id.* at 565. In particular, the *Salesforce* plaintiffs alleged that Salesforce "repeatedly assessed Backpage's operational needs," provided "targeted solutions" to address those

needs, and delivered "active, ongoing support" that was "tailored" to the requirements of Backpage's business. *Id.* at 560 (internal quotation marks omitted). Salesforce, in other words, was not alleged to have acted as a mere service provider to Backpage, but instead as a partner responsible for shaping Backpage's business and promoting its success. Plaintiffs' complaint, by contrast, merely reflects that Deutsche Bank and ISIS's fundraisers and banks found themselves "on opposite sides of . . . arm[']s-length transaction[s]," where Deutsche Bank's interest was limited to collecting fees for providing the same kinds of financial services that it would to any other customer. *Apple*, 96 F.4th at 415. That is not sufficient to plead a violation of the TVPRA.

Plaintiffs nonetheless stress that ISIS's fundraising activities could not have succeeded as they did without access to Deutsche Bank's financial services. But ISIS's need for financial services, no matter how great, does not mean that Deutsche Bank took part in the group's fundraising ventures any more than a utility company takes part in its customers' businesses by satisfying their essential demand for electricity. Congress has shown that it knows how to make material support of an unlawful organization the standard for liability, *see, e.g.*, 18 U.S.C.

§ 2339B(a)(1), but it chose not to do so in section 1595(a). Participation in a venture therefore requires more than providing financial services at arm's length.

Nor does the fact that Deutsche Bank "financially benefitted" by charging fees as consideration for its services – even if those fees were higher than normal – show participation in a venture with its customers. *Red Roof Inns*, 21 F.4th at 727. All arm's-length business transactions involve some kind of potential financial benefit. That Deutsche Bank charged fees as consideration for providing standard financial services, or even charged risk-adjusted fees to particular customers, does not indicate a purpose on its part to promote its customers' businesses or represent an interest therein.

Plaintiffs' argument that "Deutsche Bank shared in the venture's risks" is similarly unpersuasive. Pls.' Br. at 43. Although Deutsche Bank may have faced various "legal and regulatory consequences" as a result of its transactions with individuals and institutions affiliated with ISIS, *id.*, those *legal* risks do not indicate that Deutsche Bank possessed an interest in ISIS's venture that would rise to the level of "participation." Nor does the mere fact that Deutsche Bank exposed itself to such risks by processing the transactions at issue in this case show that Deutsche Bank was seeking to promote the venture as opposed to merely enriching itself.

Finally, we are unconvinced by Plaintiffs' conclusory allegations that – because Azizi characterized Deutsche Bank as his "willing financial partner," J. App'x at 34 ¶ 103 (emphasis omitted), and because "some of [Deutsche Bank's] employees participated in the Azizi Cell's VAT fraud scheme," *id.* at 36 ¶ 109 – Deutsche Bank itself participated in a terrorism fundraising venture. For the reasons stated above, "we cannot take [these] allegation[s] . . . at face value, because [Plaintiffs' complaint] has not said enough to make [them] plausible." *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 295 (2025). Consequently, they are insufficient to establish the requisite participation for a TVPRA claim.

## IV. CONCLUSION

We conclude that Plaintiffs have not plausibly alleged that Deutsche Bank participated in a qualifying venture under the TVPRA. We therefore **AFFIRM** the district court's judgment.